## D. S. FLOWERS v. J. C. SMITH, Appellant.

Division Two, July 25, 1908.

1. **PRACTICE: Motion to Strike Out Amended Petition: New Cause: Libel.** By answering over, after the overruling of his motion to strike out plaintiff's amended petition, on the ground that it was a change in the cause of action from that stated in the original petition, because in the original petition in the libel suit only five articles published in the newspaper were mentioned and declared upon, whereas in the amended petition thirteen other independent publications are declared upon, defendant waived his right to insist upon said motion on appeal.

2. **PLEADING: Libel: Joinder of Different Causes in One Count.** The setting out in one count of the petition in a libel suit, of eighteen different articles printed and published in defendant's newspaper on different days, and referring to wholly different matters and to entirely different conduct, all alleged to be libelous, is bad pleading. They do not relate wholly to one offense, but the defense to each will call for entirely different evidence, and each is therefore a separate cause of action.

3. ————: ————: ————: **Motion to Elect Overruled: Available on Appeal.** And defendant's motion to compel plaintiff to elect upon which one of the several causes of action alleged in his petition he would proceed to trial, filed before answer and overruled, is available to him in his motion in arrest and on appeal, although, after the motion to elect was overruled, he answered over on the merits.

4. ————: ————: ————: **General Verdict.** Where the several causes of action are united in one count, and the case is tried on all, if one or more of the causes of action assigned be bad, so as not to support a verdict, a general verdict, and assessment of damages for plaintiff will also be bad.

5. **LIBEL: No Particular Person.** If the defamatory matter points to no person in particular, it then becomes a question of fact whether it does or does not apply to plaintiff. Unless it is clear that it is the plaintiff to whom it refers, no action lies.

6. ————: ————: **Assumed by Instruction: Scope of Pleadings.** The answer was a general denial of each and every allegation

in the petition except this special defense: "Defendant says that in publishing the articles complained of and set forth in the petition, which said petition charges reflect upon the public and official conduct of plaintiff as a member of the municipal government of Pierce City, he acted in good faith; that such articles so published are but a recital of facts and circumstances in respect to and concerning the administration of the municipal government of Pierce City, in which voters, citizens and taxpayers were and are interested, and which they had a right to know; that such articles were published after careful inquiry as to the truthfulness of the matter stated and with the belief on defendant's part that they were true, and defendant says they are substantially true." Many of the articles complained of point to no person in particular, and some of them preclude the idea that plaintiff could be the person intended. *Held,* that an instruction telling the jury that "the defendant admits the publication of all of said articles of and concerning the plaintiff and justifies the publication of said articles by alleging that the charges made against the plaintiff in said publication are true, and defendant further alleges that said articles are not libelous," was not authorized by the answer, and was erroneous. The answer did not admit the articles were published "of and concerning the plaintiff," as the instruction assumes and states.

7. ———: ———: **Pleading.** While the statute declares that "in an action for slander it shall not be necessary to state in the petition any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose, but it shall be sufficient to state generally that the same was published or spoken concerning plaintiff," it yet remains true that all the averments necessary at common law pleading to show the meaning of the words must be made, and it is necessary to state so much of the extrinsic facts as will show their meaning and to whom they were applied, when that meaning and person are not embraced in the imputed words.

8. ———: **Not Applicable to Plaintiff: Instruction.** Where it is obvious that certain articles published by defendant were not applicable to plaintiff, or upon their face forbid any application to him by their very terms, it is error for the court, when so requested, not to specifically tell the jury that they should not consider them.

9. ———: ———: ———: **Libelous if Not True.** Where in several of the articles no reference directly or indirectly was made to plaintiff, and there were no averments in the petition that they referred to him, it is error to tell the jury that, unless they believe all the charges in the publication were true they must find for plaintiff, unless they shall further find that none

of said charges are libelous. If they did not refer to plaintiff he cannot recover, whether or not they were both false and libelous.

10. ———: **Malice: Instruction.** Where the articles were not libelous *per se*, or where the petition contains no *innuendo* from which it can be inferred that they charged the plaintiff with such conduct as to render them libelous *per se*, an instruction which tells the jury that "the law presumes they were published maliciously," is too broad. Such a presumption is proper only when the charges are libelous *per se*.

11. ———: **Good Faith: Information: Instruction: Evidence: Mitigation.** An instruction directing the jury to disregard any evidence tending to show the good faith of defendant or his honest belief in the truth of the charges published by him, or any of them, based upon information or reports of others, is erroneous, if the petition asks for punitive damages. Such facts and circumstances concerning publications complained of, and the information on which defendant acted in forming the views expressed therein, as tend to show his good faith and want of malice, are competent evidence, and an instruction which directs the jury to disregard such evidence, especially in mitigation of exemplary damages, if any, is erroneous.

12. ———: **Evidence: Rebuttal.** Testimony of a witness that he went to defendant and asked him to quit publishing the matters about plaintiff, and that defendant said he thought plaintiff had done him a wrong and believed the things were facts, is not competent in rebuttal.

13. ———: ———: **Census.** In a libel suit, based upon criticisms of a mayor, in the matter of taking a city census, under section 3023 of the Local Option Law, the defendant should be permitted to show that all that was done in the matter of taking the census was to count the names of persons, without enrolling them or giving their residences, and the filing of an affidavit by the enumerators in which they simply swore to the number of inhabitants, and also to show that no entry of an acceptance and approval of such census was made in the city's journal or records, and also to show that the enumerators counted persons residing outside the city and persons who had for years been absent—all in mitigation of exemplary damages.

14. ———: **Pleading: Commingling Causes: General Verdict: Motion in Arrest.** Where plaintiff joined eighteen separate, distinct and independent alleged libels in one count, at least five of which were wholly insufficient to support a verdict, a general verdict for plaintiff is bad, and cannot stand, and the motion in arrest should be sustained.

Flowers v. Smith.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnston,* Judge.

REVERSED AND REMANDED.

*Joseph French* and *Wm. B. Skinner* for appellant.

(1) Defendant's motion to strike out plaintiff's amended petition should have been sustained. The pleading filed as an amended petition is a substitution of a new cause of action and it therefore should have been stricken out, and this court should review this error notwithstanding defendant thereafter filed an answer and the cause was tried on such amended petition. Ross v. Land Co., 162 Mo. 317; Leslie v. Myer, 143 Mo. 547; Sidway v. Land & Live Stock Co., 163 Mo. 372, 187 Mo. 659, 197 Mo. 359. (2) Defendant's motion asking the court to require plaintiff to elect upon which one of the several alleged causes of action pleaded in his amended petition, in a single count, he would proceed to trial, should have been sustained, and error was committed in overruling such motion. Christal v. Craig, 80 Mo. 367; McHugh v. Railroad, 190 Mo. 93; Walter v. Hoeffner, 51 Mo. App. 49. (3) It is always competent to show, by way of defense, in the circumstances of this case, the facts, circumstances and surroundings of the publications complained of, the information on which defendant acted in forming the views expressed in such publications, and in this connection, where questions of good faith and want of malice are involved, evidence of general report and belief of the truth of the words published, as well as the facts and circumstances which provoked or tended to provoke the publication, may be given in evidence. Jones v. Murray, 167 Mo. 49; Callihan v. Ingram, 122 Mo. 355; Fish v. Printing Co., 102 Mo. App. 6; Friedman v. Pub. Co., 102 Mo. App. 683; Hess v. Gossy, 90

Mo. App. 439; Lewis v. Humphries, 64 Mo. App. 466.
(4) The court erred in giving instruction numbered
1 on behalf of plaintiff. It is nowhere admitted by
defendant, in the pleadings or the evidence, that all
the publications read in evidence were published "of
and concerning the plaintiff," as alleged in such in-
struction. Many of the articles complained of point
to no person in particular; some of them preclude the
idea that plaintiff could be the person intended, and,
at most, it was a question of fact whether such articles
did apply to plaintiff. Caruth v. Richeson, 96 Mo.
190; Kenworthy v. Journal Co., 117 Mo. App. 327.
(5) The third instruction given for the plaintiff is
erroneous in that some of the articles read in evidence
from the Pierce City Democrat do not and cannot, from
their very language and terms, refer to plaintiff, and
no extraneous facts are pleaded nor proved to show
that they apply to plaintiff in an actionable sense, and
even though it does not appear that such articles are
not true nor libelous, yet plaintiff could not recover
by reason thereof. Lewis v. Humphreys, 64 Mo. App.
471; Wood v. Hilbish, 23 Mo. App. 389; Christal v.
Craig, 80 Mo. 373; Kenworthy v. Journal Co., 117 Mo.
App. 327. (6) The fifth instruction given by the court
is erroneous. It is only from a publication libelous *per
se* that malice may be inferred, as a matter of law.
This instruction does not so limit the presumption of
the law. Mitchell v. Bradstreet Co., 116 Mo. 242; Wood
v. Hilbish, 23 Mo. App. 389. (7) The sixth instruc-
tion given on behalf of plaintiff is erroneous in that
it directs the jury to "disregard any evidence tending
to show defendant's good faith or honest belief of the
truth of the said charges, or any of them, based upon
the information or reports of others," meaning the
charges contained in the publications given in evidence,
as appears from the first clause of such instruction.
This declaration is directly "in the teeth" of the law,

on this branch of this case, as enunciated in the authorities above cited, under point 3. (8) The court erred in refusing the instruction asked by defendant withdrawing from the consideration of the jury the articles dated June 8th, June 10th and June 12, 1903, and March 11 and May 11, 1904. These publications are innocent, are non-actionable, no special damages are alleged by reason thereof and none were proven; in four of the five articles the plaintiff is not named or referred to in any manner, no extraneous facts are pleaded nor proved to show that these publications, or any of them, applied to plaintiff, and such publications should have been withdrawn from the jury. Christal v. Craig, 80 Mo. 373; Caruth v. Richeson, 96 Mo. 186; Kenworthy v. Journal Co., 117 Mo. App. 327; Salvatelli v. Ghio, 9 Mo. App. 155. (9) The court erred in admitting the evidence of J. G. Kelley, in rebuttal, on plaintiff's behalf, over the objection and exception of defendant. This evidence, consisting of the talk and statements of witness to defendant, was not material nor competent testimony, even in chief, much less in rebuttal, and the court abused its discretion in admitting it. Christal v. Craig, 80 Mo. 375. (10) The court erred in overruling defendant's motions for a new trial and in arrest of judgment. In the petition, plaintiff pleads and attempts to declare upon eighteen separate, distinct and independent alleged causes of action, in a single count thereof, many of which alleged causes of action are insufficient to support a verdict, under the pleadings and evidence, and this being so, the general verdict for plaintiff in this case is bad and cannot be sustained, and defendant's motion in arrest should have been sustained. Money v. Kennedy, 19 Mo. 553; Christal v. Craig, 80 Mo. 370; Salvatelli v. Ghio, 9 Mo. App. 155. (11) The verdict, both in the actual and exemplary damages awarded, is excessive, is manifestly the result of passion and prejudice on the part

of the jury, and the same should be set aside and a new trial awarded by reason thereof. McClosky v. Pub. Co., 163 Mo. 22; Friedman v. Pub. Co., 102 Mo. App. 683.

*W. Cloud, J. M. McPherson* and *R. H. Landrum* for respondent; *R. H. Davis* of counsel.

(1) The answer is not sufficient to put plaintiff upon his proof that the articles complained of were published "of and concerning" plaintiff, for the following reasons, to-wit: (a) The denial of the allegations of the petition is vague and indefinite. The denial is neither general nor specific. Each and every allegation is denied, except those which are specifically admitted. This form of pleading is what has been termed "vicious" pleading, and it is very doubtful whether it was sufficient to put plaintiff upon his proof. Snyder v. Free, 114 Mo. 367; Sidway v. Land Co., 163 Mo. 372. (b) If that part of the answer denying each and every allegation of the petition, except that which is specifically admitted to be true, standing alone, was sufficient to put plaintiff upon his proof, it was overcome by the attempted plea of confession and avoidance by way of justification. It is a rule of pleading that a general denial is overcome by a subsequent confession and avoidance. Price v. Mining Co., 83 Mo. App. 470; McCord v. Railroad, 21 Mo. App. 95; 13 Ency. Pl. & Pr., 81. (c) If the allegations of the answer are sufficient to constitute a plea of privileged publication, or if they are sufficient to show that defendant attempted to plead privilege, then the plea of privilege, or the attempt to so plead, was a waiver of the general denial. Youmans v. Paine, 86 Hun (N. Y.) 479. (d) Applying the general rules of construction to the answer in hand, there can be no question but that the answer admits that the articles complained of were published "of and concerning" the plaintiff.

If there is any ambiguity in the answer of defendant as to what it means, it will be construed against defendant and in favor of plaintiff. It is a well-understood rule of pleading that a pleading which is silent or ambiguous must be construed strongly against the pleader. Sidway v. Land Co., 163 Mo. 373; Price v. Mining Co., 83 Mo. App. 470. The rule of liberal construction of pleading only applies to the matters of form and not to the fundamental requirements of good pleading. Sidway v. Land Co., 163 Mo. 373; Young v. Schofield, 132 Mo. 661; Mallinckrodt, etc., v. Nemnich, 169 Mo. 398. (2) The plea of justification does not state facts sufficient to constitute any defense to plaintiff's cause of action. It is not sufficient to aver generally the truth of the alleged defamatory matter. If the charge is made in general terms, the particular facts relied on as constituting the charge must be set forth specifically. 13 Ency. Pl. & Pr., 82, 83 and note, 79 and note; Newell on Slander & Libel (2 Ed.), secs. 71 and 72; Atterberry v. Powell, 29 Mo. 551; Stark v. Knapp, 160 Mo. 551. (3) Mitigating facts and circumstances must, under section 636 of the Code, in order to be available in evidence, be pleaded. Baldwin v. Fries, 46 Mo. App. 288. And the mitigating facts must be pleaded with great particularity in order to be available for the introduction of evidence thereunder. Baldwin v. Boulware, 79 Mo. App. 9; Jones v. Murray, 167 Mo. 25. The plea of mitigation may be likened to a plea of fraud. In pleading fraud the facts constituting the fraud must be set out with particularity. Goodson v. Goodson, 140 Mo. 206. And where a defendant seeks to mitigate damages by pleading facts which induced him to believe the charge to be true, the facts thus pleaded must be such as would reasonably induce belief in the mind of a person possessed of reasonable intelligence. Dolevin v. Wilder, 34 How. Pr. (N. Y. Super. Ct.) 491. (4) If the amend-

ed petition substitutes a new cause of action, as claimed by defendant, the error of the court in refusing to strike it out on motion was waived by pleading over and going to trial. Castleman v. Castleman, 184 Mo. 432; Liese v. Meyer, 143 Mo. 547; Carter v. Baldwin, 107 Mo. App. 217. (5) Defendant's motion to require plaintiff to elect upon which cause of action stated in the petition he would elect to try was properly overruled for the following reasons, to-wit: (a) Each and all of the publications complained of refer, either generally or specifically, to one subject-matter, to-wit, the supposed official conduct, both of commission and omission, of plaintiff while mayor and while a member of the board of aldermen. Different publications, when they relate to the same charge, constitute but one cause of action and may be set forth in one count. Lewis v. McDaniel, 82 Mo. 577; Birch v. Benton, 26 Mo. 157; Pennington v. Meeks, 46 Mo. 217; Hoyt v. Smith, 32 Vt. 304; Rice v. Cottrel, 8 R. I. 340; Meriwether v. Knapp & Co., 120 Mo. App. 354. (b) The petition contained but one count, and states but one cause of action, and has but one conclusion for damages. Pennington v. Meeks, 46 Mo. 217. If plaintiff had pleaded only one of the several publications as a cause of action, the other publications would have been admissible in evidence as proof of express malice; and while it may not have been good pleading to plead evidence, a motion to elect is not the proper way to call the matter to the attention of the court. If any of the several publications pleaded was not libelous, defendant should have filed a motion to strike out the publication claimed not to be libelous. (6) (a) Instruction 1 given on behalf of plaintiff was properly given. After defendant, by his answer, had admitted that the articles complained of were published "of and concerning" the plaintiff, he could not by his evidence deny that they applied to plaintiff, but that they had reference to and

applied to some one else.  The defendant, in the case
of Caruth v. Richeson, 96 Mo. 186, cited by defendant,
pleaded by general denial only.  So also was the answer
a general denial only in the case Kenworthy v. Journal
Co., 117 Mo. App. 327.   (b)   The third instruction,
while not artistically drawn, properly declares the law.
It in effect tells the jury that if they find that any
one of the articles complained of was libelous and was
not proved to be true, it would be their duty to find
the issues for the plaintiff.   (c)   Complaint is also
made of instruction 5 given on behalf of plaintiff.  This
instruction properly declares the law.  If a publication
is libelous and is false and untrue, the law infers mal-
ice, unless the publication is privileged.  Fish v. Print-
ing Co., 102 Mo. App. 24; Minter v. Bradstreet, 174
Mo. 497; Buckley v. Knapp, 48 Mo. 152; Newell on
Slander & Libel (2 Ed.), secs. 11 and 12, p. 319; sec. 15,
p. 320; sec. 19, p. 322; sec. 28, p. 329.   (d)   Complaint
is also made of instruction 6 given on behalf of re-
spondent.  Appellant's good faith and honest belief of
the truth of said charges were not in issue.  If the al-
legations of the answer are sufficient to constitute a
plea of justification, the truth of the charge was the
only matter for investigation—appellant not having
pleaded facts sufficient to constitute a plea in mitiga-
tion.   Hess v. Gansez, 90 Mo. App. 445; Newell on
Slander & Libel (2 Ed.), pp. 800 and 801; Meriwether
v. Knapp & Co., 120 Mo. App. 386; Burt v. Advertiser
Newspaper Co., 13 L. R. A. 97; Upton v. Hume, 21
L. R. A. 493.

GANTT, J.—This is an action for libel commenced
and tried in the circuit court of Lawrence county.  The
defendant was the editor and proprietor of the Pierce
City Democrat, a daily and weekly newspaper printed
and published in Pierce City in said county.

The petition covers sixteen pages of printed mat-

ter and contains in one single count eighteen inde-
pendent and distinct alleged defamatory publications
of and concerning the plaintiff by the defendant. A
proper conception of the case can only be gained by
the reproduction of this petition in full, however de-
sirable it may be that a summary of it should be made
so as to not encumber our reports with unnecessary
matter. The case was tried upon an amended petition,
which is in words and figures as follows:

"Plaintiff for amended petition herein says that
the defendant, J. C. Smith, published of and concern-
ing the plaintiff, in the Pierce City Democrat, a daily
and weekly newspaper regularly printed and published
in Pierce City, Missouri, the following false, defam-
atory and libelous matters, to-wit:

"The Pierce City Democrat, June 8th, 1905:

" 'The Empire seems to take it for granted that
it can say just what it pleases, and it does. It makes
charges against the Democrat which it has no founda-
tion in truth to sustain. In regard to the city clerk
business we stated the case frankly and said that good
lawyers differed in their views as to the new act gov-
erning cities of our class. Mr. Flowers and his ad-
visers claim he has the right to appoint city clerk. Mr.
Mayhew and his friends claim otherwise. He also
has the opinion of able lawyers to sustain him, so there
you have it.'

"Same issue: 'Was there any politics in the elec-
tion of Mr. Essex city clerk? The city never had a
better clerk than they turned down to put him in and
of course there is no politics in the present contention
for the office: so "My side" says.'

"The Pierce City Democrat, June 10th, 1903, 1st
page, 3rd column: 'Dispense with the electric light
plant and build a bridge, says the Empire. Some pre-
fer darkness to light. We say turn on more light that

the people may see the official acts of our administration.'

"Same issue, 4th page, 3rd column: 'A little patronage cuts no figure with the Democrat when it comes to principle. While we prefer to have the good will of everyone, we will never sacrifice principle to do it. "One who knows" opened on the Democrat in Thursday's Empire in a very ungentlemanly manner. Because we answered him in a more mild way, he flies into a passion and says stop his paper and advertisement. A man who is that weak morally is unfit to be mayor of a city like Pierce.'

"The Pierce City Weekly Democrat, June 12th, 1903, 7th page, 2nd column: 'The communication in the Empire yesterday signed by "One who knows" misrepresents the Democrat. He says we misstated the facts. We did not go into the full details of the matter in regard to electing city clerk, from the fact that there was a difference of opinion as to the law points governing the case. Good lawyers hold opposite views about it. So far as we spoke upon the subject we stated the case as it took place. There was no twisting of the facts to suit "my side." Democracy believes in the majority ruling and Mr. Mayhew was elected by a majority of the board of aldermen. If not, why were the book and papers turned over to him? "One who knows" seems to have very poor judgment of what constitutes a Democrat. His "partisan Democrat" is just about as much a Democrat as he is.'

"The Pierce City Daily Democrat, July 3rd, 1903, 1st page, 6th column: 'The city will be without lights. The smoke stacks at the electric plant fell with a crash this morning. It was burnt and rusted out and the wind laid it flat. This means that the city will be without lights for about ten nights, as it will take at least that time to get a new smoke stack. We are told that other parts of the machinery of the plant are in

very bad shape and liable to collapse at any time. The entire plant needs overhauling and fixing, but the wise business administration of our Mayor is to build a bridge we do not need, and let the city's property that cannot well be dispensed with go to rack and ruin. The Democrat called attention to the condition of the electric plant, but the policy is to do nothing along that line until forced to it by complete break-downs. The people of Pierce City can now sit in the dark and think these things over.'

"The Pierce City Daily Democrat, March 10th, 1904, 4th page, 3rd column: 'The Mayor has ordered Marshal Tucker to see that the saloons are all closed on Sunday and blinds raised. Our people should remember that it is only a few weeks until election day in Pierce City and not be fooled. This is only for effect. It is strange that after nearly two years in office our Mayor should give this order just before election time. What fools we mortals are.'

"The Pierce City Democrat, March 11th, 1904: 'Why is it that our Mayor did not think the readers of the Democrat worthy of considering when he gave his notice of the city election? Ever since we have been in the newspaper business in Pierce City, the election notice has always been published in both papers. This is another fact where our Mayor showed his littleness.'

"The Pierce City Democrat, March 16th, 1904: 'It is said that no man can be elected to office in Pierce City that the saloon men won't support. What a record for our town. Men, voters, how do you like this medicine? The boast is made and it is up to you to do something. Be men and vote for principle.'

"The Pierce City Daily Democrat, May 3rd, 1904, 1st page, 5th column: 'The city council met last night. Mayor Edwards was not in the city. The elected officers present were sworn in. The usual monthly bills

were passed and ordered paid. The census returns, as reported by those sent out to do the work, showed 2530, but it is said they went to the country in order to raise it to that number. The scheme was well planned and carried out. It was ground hog case. They had to have enough to get out of the woods even if they had to take to the woods to do it. Will it work?'

"The Pierce City Daily Democrat, May 5th, 1904, 1st page, 4th column: 'Is there any Count Rodmans in Pierce City? Blocks of five, addition and silence. The people must keep silent. The king is on his throne.'

"Same issue, same column: 'To be frank with the people, why were not the census taken in the right, manner? Not a name was taken and we were told by a number of citizens, that no one of those sent out to take the enumeration, ever called at their home or asked them any questions as to how many they had in their family. They also went to the hotels and took the number of every person stopping there. There is a right and a wrong way of doing things. Our people are willing to abide by the truth, but they are from Missouri and must be sighted.'

"Same issue, same page, 5th column: 'We are told by responsible parties, who have taken the enumeration of school children, that it has fallen in number for the last several years. Yet our population according to the recent census has increased rapidly. How can you explain it?'

"Pierce City Daily Democrat, May 5th, 1904, 4th page, and column: 'There was a great kick at the city council Monday night over the question of extending the waterworks in the 4th ward to parties that wanted the service. Some said they did not believe in going outside the corporation limits to supply water to the country people, but at the same time the census board had gone out to the country to help swell the enumeration for the machine and that was all right and per-

fectly legitimate, in their estimation. Oh; consistency, thou art a jewel.'

"The Pierce City Daily Democrat, May 11, 1904, 1st page, 4th column: 'Some of our citizens say they do not know whether they live in Pierce City or not. On some occasions they are in, on other occasions they are not. It is kind of a new shell game. Now you see it; now you don't see it.'

"Same issue, same page, 5th column: 'It is very convenient to have an elastic corporation line. When the powers that be want to run a scheme they can stretch it out and take in territory enough for their purpose. But when people living in that strip thus taken in, want city water the elastic lines suddenly flies back and shut them out of the corporation.'

"Same issue and page, 6th column: 'Some of the people of the country are very indignant over the scheme of taking the census of Pierce City. They live near to nature and nature's God and are quick to see and resent a wrong.'

"The Pierce City Democrat, May 6th, 1907: 'Marshal Alsup tells us he simply obeyed in the matter of taking the census. We believe all that were sent out to do the work did the same. The Democrat finds no fault with them. They were instructed to take no names, not even the head of families. It was an urgent matter; no time to take names. Why was it so urgent, those who concocted the scheme can better explain than we can, and the people would like for them to do so.'

"The Pierce City Daily Democrat, May 13th, 1904, 1st page, 4th column: 'There is a deep feeling working among our people that something ought to be done to advance the interests of Pierce City; to increase our population; to put business life into active operation; to bring about a unity of feeling among our citizens; to stay the power of dissatisfaction that exist over the

evil influences that are at work to overthrow the letter of the law and good government, against the will of the people. Bosses should be retired. The man or set of men who get out and boycott every one who has a moral opinion and dare to advocate and stand by it, is an enemy to our government and a traducer of good society.'

"Same issue, 7th page, 1st column: 'The scheme of taking the census was so urgent and important to have it completed by Monday night that the Mayor put in considerable time last Sunday consulting with his lawyers.'

"The Pierce City Daily Democrat, May 15th, 1904, 1st page, 5th column: 'The saloon men of Granby called on the Mayor to have the census taken. They thought they could run the same scheme there as they did in Pierce City, but Granby had a mayor that had the census taken according to law and they lost out. The enumeration showed that Granby liked about 100 of having the required number to shut it out of voting with the county on local option.'

"Same issue, 4th column, 4th page: 'Pierce City has grown quite fast since the census was taken.— Stotts City Times. Yes, Pierce City is a fast town when it comes to taking the census. The instruction given to get the required number even if they had to take the census of the "unborn," brought the desired result.'

"The Pierce City Daily Democrat, June 25th, 1904, 1st page, 4th column: 'The last year of D. S. Flowers' administration the electric light plant run behind nearly $3,000. Under Ex-Mayor Cloud's administration, the last year that W. T. Lecompte was chairman of the electric light plant committee, he brought it out, after paying for some improvements and all expenses, with over five hundred dollars in the

214 Sup.—8

treasury. What was the matter last year? The people would like to know.'

"Same issue, page and column: 'Query: If our electric light plant earns $3,900 per year, and it takes $7,600 per year to run it, how long will it take the city to pay for it?'

"The Pierce City Daily Democrat, July 8th, 1904, 1st page, 5th column: 'We understand some* of the Republicans have disputed the statement made in the Democrat that under the management of W. T. Lecompte, the electric light plant during the first year of ex-mayor Cloud's administration, paid all expenses, beside making some improvements, and had over five hundred in the treasury. There is no guess-work about this. It is a fact of record as the papers will show. At the last meeting of the board, at the close of the first year under Mayor Cloud's administration, he asked W. T. Lecompte, chairman of the electric light plant committee, to make a written statement of the condition of the work. He did so, and after the bills had come in on that night and were allowed he deducted the amount from the amount of money in the treasury, which left a balance after all debts up to that date were paid, of $540.30. They do not want to admit this fact, after the wreck and extravagance of ex-mayor Flowers' administration, which brought the plant out last year about $2,800 in debt. Republican administrations do come high, but the people pay the bills.'

"The Pierce City Daily Democrat, July 11th, 1904, 1st page, 4th column: 'The statement that W. T. Lecompte brought the electric light plant out with over five hundred dollars in the treasury the last year he served on the board of aldermen has not been disproved. Henry Shoemaker who served on the committee with Mr. Lecompte says, it was made more than self-sustaining that year, and feels that if he had had the management of it another year he could have

brought it out over $1,000 above all expenses.    The Democrat in calling attention to this matter desires above all personal or political feeling, to stimulate a closer watch over the interest of the plant and a better management of it, for with such extravagance, it is only a question of time until we would have no public enterprises.   Our charges for electric lights are higher than those of some of the surrounding cities, we are told by those who are posted.   It is not a question of putting a heavier tax burden upon our people for electric lights, but a question of management.'

"'The ordinances of our city clearly say that no city officer shall take contracts or furnish the city with supplies.   Has not this law been violated?'

"'There is no argument in personal abuse, but it is always the resort of those who have a weak cause to defend.'

"The Pierce City Daily Democrat, July 12, 1904, 4th page, 1st column: 'When Mayor Flowers sent his agents to take the census of Pierce City his instructions were: get the required number even if you have to get the unborn.   What would you call such a man? Does his own language apply to him?   Is he no fool, though he did sit upon the judgment of our city.'

"The Pierce City Daily Democrat, August 3d, 1st page, 3d column: 'The city had to borrow money at the last meeting of the council to pay running expenses of our government.   The reckless management of ex-Mayor Flowers is the cause of the empty treasury.   The sinking fund had to be drawn upon.   No money in any other fund to tide over with.'

"The Pierce City Democrat, July 13th, 1904, 1st page, 4th column: 'It is a very plain matter that the Democrat brought before the people of Pierce City. We stated in plain figures that the last year that W. T. Lecompte was on the board of aldermen, under ex-mayor Cloud's administration, he managed the electric

light plant, so as to make it pay all expenses and for some improvements, and had a balance to the credit of the fund of $540.30. In contrast to his management ex-mayor Flowers' administration last year brings the plant out $2,800 in debt. The plant earns about $3,900 a year, so this would make it cost the city under Flowers' administration $6,600, or over $3,300 more than under Cloud's administration.'

'"Pierce City Daily Democrat, July 12th, 1904, 1st page, 2nd column: 'My, how D. S. Flowers does swell out in self-praise. In his estimation he could have chosen a much better city council than the people did by their votes. In his estimation they made a big mistake in not turning the whole thing over to him and proclaim him king, from which no appeal could be made. But it is said, figures won't lie, and there is a big difference between his estimate of himself and the fact the figures give, when not twisted to his notion. Several good business men have remarked that they cannot understand ex-mayor Flowers' statements as published. The figures are so juggled that nothing definite can be made out of them. In the first financial statement published at the end of the first year of his administration, the figures showed on their own face a mistake of over a thousand dollars in the city's favor. On three or four different occasions the Democrat called attention to the mistake and asked for an explanation. None has ever yet been given.'

"The Pierce City Daily Democrat, August 4th, 1st page, 3rd column: 'Tabled without debate said the dictator at the city hall last night, and it was so. It rests in its grave on the table. The petition of the citizens asking for a correct census was "ridiculas" said the great mogul. What right have they to dispute the authority of the King on his throne? Free speech denied the people, the right of petition snatched from them.'

Flowers v. Smith.

"The Pierce City Daily Democrat, August 1st, 1904, 1st page, 4th column: 'Nero fiddled while Rome burned. Take your medicine and say nothing. The city council met in adjourned session last night. All the alderman were present. Mayor Edwards was absent. L. L. Allen presided over the deliberations. Two petitions, each signed by a number of our citizens, were before the councilmen. Only one of them was considered worthy of their attention, the other was quickly laid upon the table. Ex-mayor Flowers spoke and that settled it. Only one class of our citizens have any voice in public questions. Moral reforms and obedience of law are not to be considered. The petition presented asking the honorable board to have a correct census taken according to law was tabled. The one presented by the saloon element asking for an election in Pierce City to vote on local option was promptly granted. In fact, it was already slated and the ordinance drawn up, the judges of election appointed, and the date fixed before the council met. The day of election fixed to vote on local option in a town with less than 2,000 population is September 2d, 1904.'

" 'They call this obeying the law. You fellows that believe in the majesty of the law; that want justice and right to prevail; that want to see our college opened; that want to do something to build up Pierce City and increase the trade, can just take your bitter medicine and keep your mouths shut. What rights have you in this land of liberty? The dictator is on his throne and has his gall with him. Go out and take the census, take all the people stopping at the hotels, all visiting in the city, all camped on the banks of Clear Creek; go get the required number even if you have to include the unborn.

" 'Last night ex-mayor Flowers stood up before an intelligent audience at the city hall and said, "The census were taken under my administration and were

taken right so far as I know.'' For unmitigated gall, vote him the whole bake shop.'

"The Pierce City Daily Democrat, August 5th, 1904, 1st page, 4th column: 'The talk of ex-mayor Flowers at the city hall last Wednesday night was anything but dignified. It was an insult to every man who had his name on the petition asking for a correct census, as well as every citizen in favor of law and order. The petition presented to the city council Monday night asking it to call an election to vote on local option, was an out-law, because it was the same one presented months ago. If it was a new one gotten up since Monday night it was acted on in an unjust manner. The petition presented Monday night by the citizens asking the board to have a correct census taken was read and put on file that night and should have been taken up and acted on first Wednesday night. The petition asking for a local option election was treated with all due courtesy. The one asking for a correct census, signed by citizens and taxpayers of our city, was held up for ridicule of Mr. Flowers. It is a very dull person who can't see and understand that only the interests of the liquor traffic was thought worthy of consideration. Take either point made above in regard to the petitions and you can see the unjust way in which the one was treated and the partiality shown in the other.'

"Plaintiff says that said publications were malicious, false and untrue, and published by the defendant for the purpose of injuring the plaintiff; that said newspaper had a general circulation in the counties of Lawrence, Barry, Newton, Jasper and McDonald in the State of Missouri; that the defendant caused wickedly and maliciously copies of said newspaper to be published and circulated in the Missouri building at the St. Louis World's Fair at St. Louis, Mo., in addition to its circulation in the counties above mentioned.

Wherefore plaintiff says that by reason of said false, libelous and defamatory publications in Pierce City Democrat by the defendant of and concerning the plaintiff aforesaid, the plaintiff has been greatly damaged in business, reputation and good name, has suffered great mental anguish, shame and disgrace to his damage in the actual sum of twenty-five thousand dollars actual damages, that by reason of said malicious, wanton and wrongful acts and doings of the defendant, plaintiff is entitled to recover twenty-five thousand dollars exemplary or punitive damages.

"Wherefore, plaintiff prays judgment for fifty thousand dollars, being twenty-five thousand dollars actual and twenty-five thousand dollars exemplary damages, and for all proper relief in the premises."

To the filing of this petition the defendant at the time objected on the ground that it was a change of the cause of action from the original petition, and because in the original petition only five of the said articles were mentioned and declared upon, and in the amended petition thirteen other independent charges and publications are asked. The motion to strike out was overruled and the defendant excepted. Thereupon the defendant filed his motion to require the plaintiff to elect upon which one of the several alleged causes of action pleaded in this single count he would proceed to trial. This motion was likewise overruled and the defendant duly excepted. Thereupon the defendant filed his answer, which is in words and figures as follows:·

"Comes now the defendant and for answer to plaintiff's amended petition herein, denies each and every allegation in such petition contained, except that which is herein specifically admitted to be true.

"Further answering, defendant says that in publishing the articles complained of and set forth in the petition herein, which said petition charges reflect

upon the public and official conduct of plaintiff as a member of the municipal government of Pierce City, Mo., he acted in good faith; that such articles so published are but a recital of facts and circumstances in respect to and concerning the administration of the municipal government of said city of Pierce City, in which the voters, citizens and taxpayers of said city were and are interested, and which they have a right to know. That such articles were published after careful investigation as to the truthfulness of the matter stated and with the belief on defendant's part that they are true, and defendant says that they are substantially true.''

Plaintiff replied by denying all the new matter alleged in the answer.

The plaintiff to maintain the issues upon his part read in evidence from the Pierce City Democrat the articles set out in the amended petition, being Exhibits A to Y included, and then introduced in evidence one witness, Allen Hudson, who testified that he lived four miles south of Pierce City, Missouri, and had known plaintiff for thirty-seven years, and that his reputation as a law abiding citizen was good. Reserving the right to call in Mr. Allen as a character witness, the plaintiff rested his case on this evidence. Thereupon the defendant offered testimony tending to prove the truth of the statements made in the said articles, and especially evidence tending to prove that a number of citizens of Pierce City signed a petition, addressed to the mayor and board of aldermen, asking that a legal and correct census of the city be taken in order to ascertain whether Pierce City was a city of 2,500 inhabitants or more, in order to ascertain whether in a certain local option election then about to occur in said county the inhabitants of Pierce City could vote at said election, or whether it would be necessary to have a separate election by the qualified voters of the

said city to determine whether intoxicating liquors should be sold or not in said city. The evidence tended to show that when this petition was presented to the council it was tabled upon a motion of the plaintiff, who at that time was a member of the board of aldermen. The evidence also tended to show that the population of Pierce City had declined since the last official census of 1900, by reason of the exodus of some 250 to 300 negroes, who had removed from said city since the taking of the census of 1900, and another census taken by the city itself in 1904. The defendant read in evidence the official report of the United States census of 1900, which showed the population to be at that time 2,151. The petition of the citizens requesting to have a new census taken, requested the board to have a correct census taken, giving the names of the inhabitants, and expressing the belief that the census taken by the city was not correct. There was also evidence tending to show that the census taken by the city itself was taken by persons who did not report the names of the inhabitants and was taken by some seven different persons, who simply reported the result of their count in a lump. And that the petitioners had employed a Mr. J. B. Williams to take the census of the city, who took the same and made oath to its correctness.

R. P. Osborn testified that he was a member of the board of aldermen of said city for three terms, and was present as a member of the board at the last meeting presided over by the plaintiff as mayor in 1904, when the said subject of local option was brought to the attention of the board by the plaintiff. That something was said in regard to a movement then being made in the county to have local option and to include the city unless the census was taken, and that plaintiff said, "We would have to have 2,500, that the census would have to be as much as 2,500 in order to

sustain our saloons and our revenue." And that plaintiff said that it would be all right to go outside of the city limits, and we would have to have 2,500, "if we had to take the unborn to get it." This witness also testified that the plaintiff appointed the enumerators and they were to meet plaintiff the next morning for instructions, and after doing so some of them refused to serve.

John B. Williams testified that he lived outside of the city limits of Pierce City, and the city's enumerators came around and counted him in taking the census of 1904; that he was present at the meeting of the board of aldermen, after plaintiff's term of office as mayor had expired, and heard plaintiff make a statement as to the financial condition of the electric light plant, in which he said that it had run behind $2,800 that year, and that the water plant had also run behind. This witness also testified to the notice given by the city marshal, Tucker, in respect to the saloons, before the spring election in 1904, and that prior to that time the screens on the saloon windows were so hung as to preclude a view of the interior of the saloon, and that the back doors of such saloons appeared to be open and men could be seen going in and out thereat carrying bottles of beer on the Sabbath day.

Defendant offered to prove by this witness that within a day or two after the alleged census taken by the city authorities of Pierce City, witness took a regular and correct census of the city, and that there had been no change in the population from the time of the alleged census until his was taken, and by actual count he knew the population of such city to be but 1,944, and that, taking in the disputed territory, the population was 2,118. This testimony was excluded by the court, and refused on general objection by counsel for plaintiff, to which ruling the defendant duly excepted.

George Soloman testified that he was an electrician and took charge of the city electric light plant at the close of plaintiff's administration as mayor, in the spring of 1904, and at that time the plant was not in extra condition, a new smokestack had been put in.

The deposition of John Tucker, one of the enumerators appointed by the plaintiff to assist in taking the city census in 1904, was offered in evidence, it appearing that Tucker had left the State at the time of the trial. On general objection this deposition was also excluded and defendant excepted. In this deposition said Tucker testified that his residence was in Pierce City, Lawrence county, Missouri; that in May, 1904, he was employed to assist in taking the census of Pierce City. He was asked by whom he was employed and he answered, "Mr. French, to come right down to business, I refuse to answer any question on this case, simply because I do not want to criminate myself. Q. Would the answer to this question tend to criminate you? Ans. It might."

E. S. Mayhew testified he was elected city clerk by the board of aldermen in 1903, by a vote of four for himself to three for Mr. Essex, and the record was turned over to him by Mr. Essex, but subsequently the plaintiff claimed the right as mayor to appoint the clerk, and did appoint Mr. Essex and refused to recognize witness as clerk, and after some controversy he withdrew, although he claimed to be legally chosen. He testified further that at the close of plaintiff's administration, there was an error of one thousand dollars in the footing of the official statement published by the plaintiff in the "Pierce City Empire."

Essex, the city clerk, was called by defendant to identify certain city records. From his testimony it appears that plaintiff appointed the enumerators to take the city census in 1904, and there were seven of them, of which number witness and John Tucker were

two. He heard no instructions from the plaintiff as to how the census should be taken, but the method followed was for each fellow to go out and make a count of the territory assigned to him. No names were to be taken or recorded and no names were ever turned in by the witness or any of the other enumerators; that the only thing done in the way of taking, filing or reporting a census to the board was that each fellow said how many he had counted, and five out of the seven joined in the one affidavit as to the total number counted by all. Two of the enumerators, Gilman and Williamson, refused to serve and did not join in the affidavit, Alsup and Tucker claiming to have covered the territory assigned to them. Witness testified that this affidavit was all that was ever filed with the board, and there was nothing on file from which it could be be ascertained who had been counted in reaching the result.

The defendant offered to prove by Mrs. Sheets that one of the enumerators came to her house and that she had two daughters, one of whom had been gone for sixteen years and another four years. And counsel for defendant offered to prove by her that these two daughters were counted by the enumerator, but this evidence was excluded and defendant excepted. Defendant offered to prove similar facts by other witnesses, but the testimony was excluded.

Defendant Smith testified in his own behalf that in the first article set forth in the petition of June 8, 1903, where the name ''Empire'' appears reference was had to the other local newspaper published in Pierce City, and that the statement concerning the ''Empire'' was true; that the first part of the second article mentioned in the petition of June 10, 1903, was a quotation from the ''Empire,'' it was advocating the building of a bridge, and that ''one who knows'' was an anonymous correspondent who wrote for the ''Em-

pire." On objection by counsel for plaintiff the court refused to permit the defendant to explain the third article of June 12, 1903, to which ruling the defendant excepted. Witness was likewise denied the privilege of explaining the fourth article, the one of July 3, 1903, in regard to the falling of the smokestack. The same ruling was made in regard to the article of March 10, 1904, to the effect that the mayor had ordered the city marshal to see that the saloons were closed on Sunday, and the screens raised, and exceptions saved. Defendant testified that he had been connected with the publication of the Democrat for thirty years, and the custom had always been with all city administrations to publish election notices in both the local papers, and such notices prior to 1904 had always been handed to him. Witness's attention was next called to the publication of May 13, 1904, with reference to boycotting. No person is mentioned in the article, and there was no allegation that the defendant thereby referred to the plaintiff. Witness was asked to state to whom reference was made in the article, but on objection of the plaintiff he was not permitted to answer and the testimony was excluded and the defendant excepted. Witness then testified that he had been told by Mr. Edwards, the mayor, to notify the people through his paper to meet the council when the petition of the citizens asking that a correct census be taken was to come before that body, and that they would be accorded a hearing; that witness did so, and he with others were present on that occasion, but Mr. Edwards was absent and a man named Allen was in the chair, and plaintiff took up the petition that had been presented and pronounced it ridiculous and said that those who had taken the census would compare favorably with those who had signed the petition, and on his motion the petition was tabled and the petitioners were given no chance to be heard.

In rebuttal a Mr. J. G. Kelley, over the objection of the defendant, was permitted to testify that he had requested defendant not to publish the articles concerning the city administration, which were appearing from time to time, but defendant had continued to do so. Essex testified that he did not hear the talk of plaintiff as detailed by the witness Osborn, and that the ordinance requiring the saloons' screens on the windows, on the Sabbath day to be kept up, was passed March 17, 1904. Mr. Garrett testified he was a member of the council and did not hear plaintiff give any instructions to the enumerators, and could not remember plaintiff's speech when he moved to table the petition for a new census. Stalter testified he was one of the enumerators and was at plaintiff's store the next morning after his appointment, but received no instructions as to how he was to discharge his duties. Alsup testified he was one of the enumerators for taking the city census, but did not hear the remarks of plaintiff testified to by Osborn; that he went to the hotels and private houses of people in his territory and inquired how many people lived there and put down the number given him; that he was not sworn, but entered upon his duty and took no names but just kept count by marks, because he was told to do so. Williamson testified that plaintiff gave him no instructions, and that while he was appointed to help with the census, he became sick and quit the job. Gilmore's deposition was read, in which he said that plaintiff said, "They had to have 2,500 people." L. L. Allen testified that plaintiff's reputation as a law-abiding citizen was good, that he, witness, presided in the council the night the petition of the people for correct census came before that body, but he did not know that the people desired to be heard or he would have given them an opportunity.

The plaintiff Flowers testified at length, giving

his version of the matters in controversy. He corroborated in the main the testimony of the defendant in regard to his appointing Essex city clerk in lieu of Mayhew, who had been elected by the city council. He detailed at length the question in regard to who had power to appoint the clerk, he also testified to calling in the defendant Smith and directing him to stop his paper and take out his business advertisement. In regard to the electric light plant, he testified that it was old and worn out when the city bought it fifteen years before that time. He testified that his management of that plant was all right with no extravagances. The city council was voting the money to keep it going and not himself. In regard to the cost of running it, he said the increase in the cost was in the price of coal, and that the expenses were greater than the receipts from the plant. In 1904 there was a deficit of $2,107.23. The published statement showed a deficit of $2,841.63, when it should have been $2,572.03. The defendant had never requested witness to allow him to make an examination of the books. He was asked what effect the falling of the smokestack had on the electric light, and he answered none whatever. In regard to the census, he testified that on the 28th of April a petition came before the board for a local option election, signed by possibly fifty or fifty-one, any way it was over one-tenth of the required number. Witness as mayor called a meeting of the board for the purpose of determining what action should be taken. At that meeting witness presented a local option petition and explained to the board that in order to determine whether we could hold a local option election in Pierce City or not, we would first have to determine whether we had 2,500 or over. This meeting resulted in our adopting an ordinance to take the census, and by that ordinance he was authorized to appoint enumerators. He testified that after an informal

talking around the council table, they settled upon the number of enumerators, and they were appointed. He himself had no list and presented no list of names to the board before he appointed them. He gave no instructions to them. He testified that he did not say that they must get 2,500 if they had to go outside of the city to get them, nor that they must get 2,500 if they had to take the unborn. He testified that he made the motion to lay the petition of the citizens for a new census on the table and it was carried. He admitted that he made the statement that the electric light plant was $2,800 short, and that the water plant was also behind. In regard to the one thousand dollar mistake in the footing, he said it was really not a mistake, but was misleading. He was asked if he remembered telling Mr. Robinson that the city did not have 2,500 population, and he said he did not.

In rebuttal Mr. Robinson was called, and defendant offered to prove by him that plaintiff said to him in January, 1904, that Pierce City did not have 2,500 people, but on objection by counsel for plaintiff the court refused to permit witness to answer the question and defendant excepted.

This was substantially all of the evidence. Such of the instructions as are challenged will be noted and discussed in the course of the opinion. There was a verdict and judgment for plaintiff for one thousand dollars compensatory and five thousand punitive damages.

I.   The defendant having answered over to the amended petition after the overruling of his motion to strike out the same, his motion to strike out is no longer available to him.

II.   The defendant moved the court to compel plaintiff to elect upon which of the alleged libelous articles he would seek to recover, but the court over-

ruled the motion and defendant duly excepted. A reference to the petition will show that there are eighteen different articles charged to have been libelous and all inserted in one count. These various articles are alleged to have been printed and published on different days. Some of them relate to plaintiff's action in appointing a clerk for the city; others to plaintiff's action in regard to the denial of the petition of the citizens for a correct census; still others contain a criticism of plaintiff's financial management of the electric light and water plants of the city; others refer to his closing the saloons on Sunday. All of these are joined in one count. It is obvious that if these various articles amount to libel they constitute separate and distinct libels, and the defendant resorted to the only course open to him to require the plaintiff to elect the charge on which he would seek a recovery and dismiss the others. [Mooney v. Kennett, 19 Mo. 551; Otis v. Mechanics' Bank, 35 Mo. 128; Christal v. Craig, 80 Mo. 367; McHugh v. Railroad, 190 Mo. 85.] Having filed his motion in due time and the court having overruled it, his exceptions to the action of the court are properly before us for review.

The motion should have been sustained. While such alleged libels may be joined in one petition in different counts, it was bad pleading to state them all in one count. The contention of plaintiff that they constitute but one cause of action and were properly joined in one count, finds no support in the cases of Birch v. Benton, 26 Mo. 153, and Pennington v. Meeks, 46 Mo. 217. As said by Judge PHILIPS, in Christal v. Craig, 80 Mo. 1. c. 370, "The case of Pennington v. Meeks, 46 Mo. 217, related solely to one offense, the alleged stealing of a hog. So in the case of Birch v. Benton, 26 Mo. 153, there was really but one actionable speaking alleged, though in different phraseol-

ogy." Whereas, as already said, if any one of these articles amounted to libel, they refer to entirely different conduct on part of plaintiff, and to wholly different matters. A criticism of the plaintiff because he appointed Essex clerk instead of Mayhew has no place in the count reflecting upon plaintiff's financial management of the electric light plant, nor the most remote connection with plaintiff's conduct in relation to the city census of 1904. The defense to each of these charges would naturally call for entirely different evidence. Moreover, this improper joinder is open to the defendant on his motion in arrest. As was said in Christal v. Craig, 80 Mo. l. c. 371, "Suppose the fact be in this case that among the causes thus united in the same count, one or more be bad for failure of a sufficient statement, and there is a general verdict on all the causes, would the verdict and the judgment be upheld? The rule is well settled that where the petition contains several causes of action stated in separate counts, if one of the counts be bad for insufficiency in statement, a general verdict for plaintiff on all the counts will not be sustained. [Brownell v. Railroad, 47 Mo. 243, and cases cited.] On principle it must obtain that where the several causes of action are united in one count, and the case is tried on all, and a simple verdict and assessment of damages in favor of the plaintiff, if one or more of the causes of action assigned be bad, so as not to support the verdict, the verdict must be bad as to all. How is it possible for the court to tell whether the jury took one or all the alleged slanderous words into their estimation? How much proof of the imperfect cause, and how much of the good, did the jury consider? Was it the fact proved touching the bad count that influenced the verdict, and if so, to what extent?"

III.  In its first instruction the court instructed the jury "that the defendant admits the publication of all of said articles of and concerning the plaintiff and justifies the publication of said articles by alleging that the charges made against the plaintiff in said publications are true, and defendant further alleges that said articles are not libelous."  This instruction involves the proper interpretation of the answer of the defendant.  The answer was a general denial of each and every allegation in the petition, except the following special defense:  "Defendant says that in publishing the articles complained of and set forth in the petition, which said petition charges reflect upon the public and official conduct of plaintiff as a member of the municipal government of Pierce City, Missouri, he acted in good faith; that such articles so published are but a recital of facts and circumstances in respect to and concerning the administration of the municipal government of Pierce City, in which the voters, citizens and taxpayers of said city were and are interested, and which they had a right to know; that such articles were published after careful inquiry as to the truthfulness of the matter stated and with the belief on defendant's part that they were true, and defendant says they are substantially true."  The question is, can this answer fairly be said to admit that the publications charged in the petition and read in evidence were published "of and concerning the plaintiff" as stated in the instruction?  Many of the articles complained of point to no person in particular, and some of them preclude the idea that plaintiff could be the person intended.

In Caruth v. Richeson, 96 Mo. l. c. 190, it was said by this court:  "The law is well settled that if the defamatory matter points to no person in particular, it then becomes a question of fact whether it does or does not apply to the plaintiff."  In Odgers

on Libel and Slander, 118, 127, 128, it is said: "Even when the meaning of defendant's words is clear or has been ascertained, the question remains, has he said enough? Was the imputation sufficiently definite to injure the plaintiff's reputation? Is it clear that it is the plaintiff to whom he refers? Unless these questions can be answered in the affirmative, no action lies. There must be a specific imputation cast upon the person suing." The special matter pleaded in this answer simply admits the publication of the articles and not that they were published "of and concerning the plaintiff." The defendant had denied all the allegations of the petition, among others, the essential averment that those articles were published of and concerning the plaintiff, and in his special plea admitted only that he published the articles, and alleged in addition that they were published as a recital of facts in respect to and concerning the administration of the city government. In Long v. Long, 79 Mo. l. c. 649, this court had this precise question under consideration, and said: "The reply to new matter in the answer is similar to the answer to the petition, and it may contain a general or special denial. Van Sant., Pleading, 408, declares that the 'code allows the defendant to elect whether he will answer by a general or special denial, and having elected, he is bound by it. He cannot answer in both ways.' [Dennison v. Dennison, 9 How. Pr. 247.] We are not prepared to say that both modes of pleading may not be employed in the answer or replication. But we do not hesitate to hold that when both are employed the denials ought to be so framed as to leave no doubt in the mind of the court and the adverse party as to what is denied and what is admitted. This course not only sharpens the issues, but it aids in the preparation of evidence and lessens expense in bringing witnesses to meet matters not designed to be controverted. This

reply says: 'Plaintiff denies each and every allegation not herein admitted or otherwise pleaded to.' Then what is admitted or otherwise pleaded to? To determine this the opposing counsel and the court must go through the pleading analytically, step by step, to discover what perchance may be admitted or denied. Bliss, Code Pleading, section 331, says the pleader should so frame the denial as not to leave his adversary to thus hunt through the plea to see what is or what is not therein 'admitted.'" Accordingly, it was ruled in that case that the court should have sustained a motion to have compelled the plaintiff to make certain what he denied and what he admitted. Fully recognizing the authority of that case and fully concurring in the view therein expressed, we do not think this answer is open to the objection made to the reply in that case. Here there is a general denial of every allegation in the petition, followed by a specific admission of the publication only of the articles and a plea of good faith, and that the same were simply a recital of facts and circumstances concerning the administration of the municipal government. We do not think this was an admission that the various articles set forth in the petition were published of and concerning the plaintiff. Our statute declares that "in an action for slander, it shall not be necessary to state in the petition any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose, but it shall be sufficient to state, generally, that the same was published or spoken concerning the plaintiff." [Sec. 635, R. S. 1899.] In Christal v. Craig, 80 Mo. l. c. 373, it was said: "This provision, however, dispenses with the employment of the *colloquium* only so far as it shows 'that the defamatory words applied to the plaintiff,' and goes no further. 'All the averments necessary in common law pleading to show the

meaning of the words must still be made.' [Bliss, Plead., sec. 305.] The change made by the statute in the rule of pleading in this respect, is not to require a statement of the extrinsic facts showing the application of the words to the plaintiff. But the extrinsic facts, when not embraced in the imputed words, to show their meaning and the character of the person to whom applied, must still be stated as at common law. [Fry v. Bennett, 5 Sandf. 54; Pike v. Van-Wormer, 5 How. Pr. 171; Curry v. Collins, 37 Mo. 328, 329.] But it is said the *innuendo* supplies the defect, in that it says: 'Meaning that he was not a child of plaintiff's husband.' The office of the *innuendo* is simply to apply the words. It is never a substitute for an averment. It is not the statement of a fact, but an inference. Being merely explanatory in its function, the only question raised by it is, whether the explanation given be a legitimate deduction from the fact stated. [Birch v. Benton, 26 Mo. 154; Bundy v. Hart, 46 Mo. 464.]''

It was then a question of fact whether such articles did apply to the plaintiff and it was error for the court to assume that the defendant had admitted that he published the same of and concerning the plaintiff.

IV. In this connection the defendant prayed the court to instruct the jury as follows: ''The court instructs the jury that under the evidence in this case, the articles charged to have been published of and concerning the plaintiff as of the following dates: June 6, June 8, 1903, on page 2 of plaintiff's petition; June 10, 1903, on page 3 of plaintiff's petition; June 12th, 1903, on page 4 of plaintiff's petition; March 11, 1904, on page 6 of plaintiff's petition; May 11, 1904, on page 9 of plaintiff's petition; May 15, 1904, on page 11 of plaintiff's petition, there is no evidence to sustain, and you will not consider them in arriving

at your verdict.'' Which instruction the court refused and defendant excepted.

In other words, the court was requested to direct the jury that the publications in the petition numbered 1, 2, 3, 6, 11, and 14, did not as a matter of law constitute libel, but the court refused to so instruct. It is perfectly obvious that the said articles not only did not refer to plaintiff, but they forbid any application to him by their very terms. Not only that, but they were not libelous *per se* of any person, and as to the others there were no prefatory averments of extrinsic facts showing that said articles imputed any crime or conduct to plaintiff, which would render them libelous of plaintiff. We think the circuit court erred in refusing to instruct the jury that said articles would not be considered in arriving at their verdict. [Wood v. Hilbish, 23 Mo. App. 389; Lewis v. Humphries, 64 Mo. App. 471; Kenworthy v. The Journal Co., 117 Mo. App. 327.]

V.   In the third instruction, the jury were told, ''Unless the jury believe from the evidence that all charges in the publications in the Pierce City Democrat and read in evidence are true, then you must find the issues for the plaintiff, unless you further believe that none of said charges are libelous.'' As already said, in many of these publications no reference whatever was made directly or indirectly to plaintiff and there were no averments to show that he was referred to in them, or would any reader of such publications understand him to be referred to. So that even if it did appear that they were both false and libelous, plaintiff could not recover. The instruction was erroneous and misleading.

The fifth instruction given by the court in behalf of the plaintiff is as follows: ''The court instructs the jury that the term 'malice' as used in these in-

structions does not mean mere spite or ill-will, but it means the intentional doing of a wrongful act without just cause or excuse. You are therefore instructed that if you believe the articles published in the Pierce City Democrat and read in evidence were libelous in whole or in part, and that they were published of and concerning the plaintiff and were not true, then the law presumes that they were published maliciously, and it was not necessary to prove any express malice in order to warrant a verdict for the plaintiff.'' It will be observed that this instruction permits the jury to infer malice from the various articles published and set forth in the petition without confining the presumption to those charges, if any, which were libelous *per se.*

It is perfectly evident, we think, that a number of said articles not only did not refer to the plaintiff, but others of them were not libelous *per se,* and there were no averments of extrinsic facts to show that they referred to the plaintiff, or any *innuendo* from which it could be inferred that they charged the plaintiff with such conduct as to render them libelous *per se.* This being so, we think the instruction was entirely too general and broad. In Mitchell v. Bradstreet Co., 116 Mo. l. c. 240, it was said by this court: ''It is next contended that the publication was not libelous *per se,* and that therefore it was necessary for plaintiffs to allege in their petition, and also prove special damages, before being entitled to recover. The authorities cited by defendant do not sustain this contention. If the libel complained of is not actionable *per se,* then defendant's position is correct, otherwise not.'' And this we understand is well-settled law.

VI. In the 6th instruction the court instructed the jury that they would disregard any evidence tending to show the defendant's good faith or honest belief of the truth of the said charges, or any of them, based upon information or reports of others. It will

be remembered that in this case the plaintiff sued for punitive damages.

In Callahan v. Ingram, 122 Mo. 372, it was said by this court: "Exemplary damages may always be given in suits for slander when the words are maliciously spoken, but whether such damages should be given in any case, is a matter within the discretion of the jury. In order to show good faith, and want of malice, the defendant has the right to put in evidence all the circumstances under which the words were uttered, and if such circumstances tend to rebut malice, such damages could only be awarded in case the words were maliciously spoken, but may, in themselves, be sufficient proof, if malice is implied therefrom. Plaintiff, by *innuendo*, charged that defendant, by the slanderous words used, intended to impute to him corruption in office. Defendant, by answer and in mitigation of damages, admitted that the words spoken had respect solely to plaintiff's official conduct. Defendant offered, as was his right to do, evidence tending to prove the circumstances under which the objectionable words were used in order to prove good faith and want of malicious intent. As has been said, defendant, as an interested citizen, had the right to make reasonable comment and fair criticism upon plaintiff's official conduct, but he had no right to go beyond that and slander him. It was, in view of all the circumstances, for the jury to say how far the evidence mitigated the malice, if at all, and to award the damages accordingly. We think the effect of the instruction on the measure of damages was to ignore this defense, and, as the question of exemplary damages was a matter independent of the right to recover, the error was not cured by the first instruction, which required a finding that the words were maliciously spoken, in order to a recovery for any amount." This court in that case further said: "The motives or purposes with which the words

were spoken lie at the very foundation of malice. They are the very conditions upon which exemplary or punitive damages are predicated, and no good reason appears why defendant should not be permitted to prove what his motives were.    Odgers says: 'In all cases, the absence of malice, though it may not be a bar to the action, may yet have a material effect in-reducing the damages.    The plaintiff is still entitled to reasonable compensation for the injury he has suffered; but, if the injury was unintentional, or was committed under a sense of duty, or through some honest mistake, clearly no vindictive damages should be given.    In every case, therefore, the defendant may, in mitigation of damages, give evidence to show that he acted in good faith and with honesty of purpose, and not maliciously.'    [Odgers on Libel and Slander, 317.]''  This statement of the law was approved in Jones v. Murray, 167 Mo. l. c. 49.  In our opinion it was competent for the defendant to show his good faith in mitigation at least of the damages, under the facts developed.  In this case the facts and circumstances concerning the publications complained of, the information on which the defendant acted in forming the views expressed in such publications, as tend to show his good faith and want of malice, were competent, and the instruction was therefore erroneous in that it was not confined to allowing such evidence as a mitigation to the exemplary damages, if any, suffered by the plaintiff.

VII.    Again, the court permitted the plaintiff in rebuttal to prove by one J. G. Kelley that he went to the defendant and requested him to quit publishing those things and asked him not to publish any more of them, and defendant said he thought the plaintiff had done him wrong and believed this matter was a fact, and other similar statements.    This evidence we think was not competent in rebuttal and should

have been excluded by the court. [Christal v. Craig, 80 Mo. l. c. 375.]

VIII. It is insisted that the court erred in excluding evidence offered by the defendant, as to the proffered testimony of the defendant himself, to explain articles appearing in his paper in reply to articles in the "Empire." We think defendant unquestionably had a right to this evidence. Likewise he had the right to explain that certain articles which made no reference to plaintiff were not intended to refer to plaintiff.

The court excluded evidence tending to discredit the census taken under the direction of the city council of Pierce City in April, 1904, and this is urged as error with much earnestness by the defendant. By section 3028, Revised Statutes 1899, it is provided: "For the purpose of determining the fact of whether or not any town shall be governed by the provisions of this section, such body having legislative functions therein may, under an ordinance thereof, take a census of the inhabitants of such town, and the result of such census shall be entered upon the journals or records thereof, and such entry, or a certified copy thereof, shall be proof of such fact, and shall be filed with the clerk of the county in which such town is situated." In this case neither party introduced the ordinance under which the alleged census was taken, or at least it does not appear in this record anywhere, so it is impossible to state whether the census was taken pursuant to the ordinance itself. But from the testimony of Mr. Essex, the clerk of the city, it affirmatively appeared that the enumerators who took the said census, took no names and made no return of the list of persons whom they counted in estimating the population of said city. The statute just cited, which authorizes such a census, requires that "the result shall be

entered upon the journals or records thereof,'' and such entry shall be proof of such fact and shall be filed with the county clerk. No such entry was ever offered in evidence, or if it was it has not been preserved in the record. From Mr. Essex's testimony it appears that the only paper filed by the enumerators was a joint affidavit of the result of their count. There was nothing on file from which it could be ascertained who had been counted in reaching said result. If the ordinance contemplated this character of a census, it was, to say the least, a very loose piece of legislation. The taking of this census was a public matter of deep local interest to the citizens of that city, and the criticism of the manner in which it was taken was directed to public official conduct. While the defendant had no right to libel the plaintiff in regard thereto, he did have the right to discuss the question whether said census was properly or improperly taken, and we think it was entirely competent, in mitigation of any damages that plaintiff might recover, for defendant to show that the enumerators went outside of the corporate limits of the city in making their count. The question was not whether this census would be prima-facie evidence of the population of the said city in a collateral proceeding, but the question was whether defendant had maliciously libeled and slandered the plaintiff in regard to the method by which that result had been achieved. We think that the court clearly erred in rejecting this testimony on this issue in this case. It went at least to the mitigation of damages on the claim for exemplary damages. The statute permitting the taking of this census is very indefinite and it may be that in the absence of a requirement that the names of the various inhabitants should be listed and returned to the city council, that is not necessary. But as to that we express no opinion at this time, further than we have already said, that this method was certainly

open to criticism in view of the efforts made at that time by the citizens of Pierce City to have a correct and reliable census taken in accordance with the statute cited and also section 6300, Revised Statutes 1899.

However, we are not to be understood as holding that the testimony of Mrs. Sheets as to the statement made to her was competent, unless she could testify of her own knowledge that Stalter actually counted her two daughters who were not residents of said city. And the same ruling must prevail after the offer to make similar proof by Mr. Par and Mr. Hawkins.

We will add, however, that.if the affidavit of the enumerators is the only thing on file in the office of the city clerk, and no action was taken by the council accepting and approving that report and spreading the same on the record, it does not comply with the requirements of the statute and would not be prima-facie evidence of the correctness of said census.

IX.    Finally, we think the motion in arrest of judgment should have been sustained for the reason that the plaintiff joined eighteen separate, distinct and independent alleged libels in one count, at least five of which, as we have seen, were wholly insufficient to support a verdict, and this being so, the general verdict for the plaintiff is bad and cannot be sustained.    [Mooney v. Kennett, 19 Mo. 553; Christal v. Craig, 80 Mo. l. c. 370, 371; McHugh v. Railroad, 190 Mo. l. c. 93.

We are aware that this opinion will occupy entirely too much space in our reports, but we see no escape from it, as no one can understand the character of the pleadings, the question as to the misjoinder of counts and the sufficiency of the allegations to constitute libel without having the petition before them, and the statute requires that we should make a statement sufficient for the understanding of the opinion.

The judgment is reversed and the cause remanded in order that the circuit court may proceed in accordance with the views herein expressed.

*Fox, P. J.,* and *Burgess, J.,* concur.